IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF OHIO

EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) CASE NO. |
| Plaintiff, | ) |
| | ) |
| | ) JUDGE |
| v. | ) |
| | ) |
| $2,244,772.28 SEIZED ON OCTOBER 18, 2017, FROM HUNTINGTON NATIONAL BANK ACCOUNT NUMBER ******3545, | ) |
| | ) **COMPLAINT IN FORFEITURE** |
| | ) |
| $390,066.00 IN U.S. CURRENCY SEIZED ON OCTOBER 18, 2017, FROM THE RESIDENCE OF RYAN SHERIDAN, | ) |
| | ) |
| 2016 CADILLAC ESCALADE, VEHICLE ID NUMBER: 1GYS4JKJ8GR403801, SEIZED ON JANUARY 10, 2018, | ) |
| | ) |
| 1981 DELOREAN ("BACK TO THE FUTURE" VEHICLE), VEHICLE ID NUMBER: SCEDT26T1BD006297, SEIZED ON JANUARY 10, 2018, | ) |
| | ) |
| 1959 CADILLAC HEARSE, VEHICLE ID NUMBER: 59Z023268 (GHOSTBUSTERS VEHICLE), SEIZED ON JANUARY 10, 2018, | ) |
| | ) |
| 1995 CHEVROLET CAPRICE WAGON, VEHICLE ID NO.: 1G1BL82P4SR124711 ("BATMOBILE"), SEIZED ON JANUARY 10, 2018, | ) |
| | ) |
| 2015 CHEVY SILVERADO, VEHICLE ID NUMBER: 1GC2KVEG7FZ533179, SEIZED ON JANUARY 10, 2018, AND | ) |

CONTENTS OF LPL FINANCIAL ACCOUNT  )
68**-**** SEIZED ON FEBRUARY 2, 2018;  )
BALANCE AS OF 02/02/2018: $326,707.62,  )
                                                     )
                       Defendants.  )

## COMPLAINT IN FORFEITURE

NOW COMES plaintiff, the United States of America, by Justin E. Herdman, United States Attorney for the Northern District of Ohio, and James L. Morford, Assistant U.S. Attorney, and files this Complaint in Forfeiture, respectfully alleging on information and belief the following:

### JURISDICTION AND INTRODUCTION

1.      This Court has subject matter jurisdiction over an action commenced by the United States under 28 U.S.C. Section 1345, and over an action for forfeiture under 28 U.S.C. Section 1355(a).  This Court also has jurisdiction over this particular action under 18 U.S.C. Section 981(a)(1)(C) and 18 U.S.C. Section 981(a)(1)(A).

2.      This Court has *in rem* jurisdiction over the defendant properties pursuant to: (i) 28 U.S.C. Section 1355(b)(1)(A) because acts giving rise to the forfeiture occurred in this district; and, (ii) 28 U.S.C. Section 1355(b)(1)(B), incorporating 28 U.S.C. Section 1395, because the action accrued in this district.

3.      Venue is proper in this district pursuant to: (i) 28 U.S.C. Section 1355(b)(1)(A) because acts giving rise to the forfeiture occurred in this district; and, (ii) 28 U.S.C. Section 1395 because the action accrued in this district.

4.      This Court will have control over the defendant properties through service of arrest warrant(s) *in rem*, which the United States Marshals Service (USMS) will execute upon the defendant properties.  *See*, Supplemental Rule G(3)(b) and G(3)(c).  With the exception of

the defendant Contents of LPL Financial Account 68**-****, the defendant properties are now in the custody of the USMS. Pursuant to the execution of a federal seizure warrant on February 2, 2018, LPL Financial has put a full restriction on LPL Financial Account 68**-****, which will prohibit any withdrawals.

5. The defendant properties are subject to forfeiture to the United States under 18 U.S.C. Section 981(a)(1)(C) in that they constitute – or are derived from – proceeds traceable to violation(s) of 18 U.S.C. Section 1347 (health care fraud) and 18 U.S.C. Section 1349 (conspiracy to commit health care fraud).

6. The defendant properties also are subject to forfeiture to the United States under 18 U.S.C. Section 981(a)(1)(A) in that they were involved in a transaction(s) in violation of 18 U.S.C. Section 1957 (money laundering), or are property traceable to such property.

**DESCRIPTION OF THE DEFENDANT PROPERTIES**

7. The following properties are the defendant properties in the instant case:

a.) $2,244,772.28 seized pursuant to the execution of a federal seizure warrant on October 18, 2017. The seizure of the defendant $2,244,772.28 was made from Huntington National Bank Account Number ******3545, in the name of Sheridan Enterprises, LLC (authorized signer: Ryan Sheridan).

b.) $390,066.00 in U.S. Currency seized pursuant to the execution of a federal search warrant on October 18, 2017. The seizure of the defendant currency was made at the Spring Hill Drive, Leetonia, Ohio, residence of Ryan Sheridan. The defendant currency, which consisted of numerous stacks of U.S. currency banded with bank bands, was found inside a gun safe in a room in the basement of the residence.

c.) 2016 Cadillac Escalade ESV, VIN: 1GYS4JKJ8GR403801, seized pursuant to the execution of a federal seizure warrant on January 10, 2018. The seizure of the defendant vehicle was made at the Spring Hill Drive, Leetonia, Ohio, residence of Ryan Sheridan. The defendant vehicle was purchased on August 3, 2016, for $93,138.36 and is titled to Braking Point Recovery Center, LLC.

d.) 1981 DeLorean DMC Gullwing ("Back to the Future" vehicle), Vehicle ID Number: SCEDT26T1BD006297, seized pursuant to the execution of a federal seizure warrant on January 10, 2018. The seizure of the defendant vehicle was made at **** Marshall Road, Girard, Ohio. The defendant vehicle was purchased on August 3, 2016, for $51,300.00 and is titled to Sheridan's Cool Cars, LLC.

e.) 1959 Cadillac Hearse ("Ghostbusters vehicle"), VIN: 59Z023268, seized pursuant to the execution of a federal seizure warrant on January 10, 2018. The seizure of the defendant vehicle was made at the Spring Hill Drive, Leetonia, Ohio, residence of Ryan Sheridan. The defendant vehicle was purchased on October 12, 2016, for $145,359.00 and is titled to Ryan P. Sheridan.

f.) 1995 Chevrolet Caprice Classic Wagon ("Batmobile"), Vehicle ID Number: 1G1BL82P4SR124711, seized pursuant to the execution of a federal seizure warrant on January 10, 2018. The seizure of the defendant vehicle was made at **** Marshall Road, Girard, Ohio. The defendant vehicle was purchased on September 8, 2016, for $160,359.00 and is titled to Ryan P. Sheridan.

g.) 2015 Chevrolet Silverado 2500, VIN: 1GC2KVEG7FZ533179, seized pursuant to the execution of a federal seizure warrant on January 10, 2018. The seizure of the defendant

4

vehicle was made at **** Marshall Road, Girard, Ohio.  The defendant vehicle was purchased on October 18, 2016, for $42,606.39 and is titled to Braking Point Leasing, LLC.

      h.)      Contents of LPL Financial Account 68**-****.  Ryan Sheridan is the sole account holder on the account, which is a non-retirement brokerage account.  Pursuant to the execution of a federal seizure warrant on February 2, 2018, LPL Financial has put a full restriction on the account, which will prohibit any withdrawals.  As of February 2, 2018, the balance of the account was $326,707.62.

      8.      The Federal Bureau of Investigation (FBI) commenced an administrative forfeiture proceeding against the defendant $390,066.00 in U.S. Currency seized from the residence of Ryan Sheridan on October 18, 2017.  A claim to the defendant currency was submitted in the administrative forfeiture proceeding by Ryan Sheridan.

**FORFEITURE**

I.     *Background: Braking Point Recovery Center and Ryan Sheridan*

      9.      Braking Point Recovery Center ("Braking Point") was an alcohol and drug rehabilitation center that provided detox, intensive outpatient treatment, day treatment, and supplemental living rehabilitation.  On January 12, 2015, Ryan Sheridan, through the Ohio Secretary of State, obtained a trade name for Braking Point at 45 North Canfield Niles Road, Suite 1000, Austintown, Ohio 44515, and listed the general nature of the business as providing intensive outpatient treatment, drug testing, and house arrest.  On November 3, 2015, Braking Point Recovery Center, LLC, was formed.  Sheridan is the 100% owner.

      10.     Ryan Sheridan ("Sheridan") is the founder and owner of Braking Point.  Prior to operating Braking Point, Sheridan worked at a driver's intervention program for individuals

convicted of driving under the influence.  Sheridan's residence is located on Spring Hill Drive in Leetonia, Ohio.

11.     JMS is Ryan Sheridan's ex-wife.  JMS was responsible for billing health insurance companies for the services provided at or by Braking Point.  JMS resides in Austintown, Ohio.

12.     KG was the Program Director for Braking Point's facility in Austintown, Ohio. On November 14, 2012, KG obtained a Chemical Dependency Counselor Assistant (CDCA) license by the State of Ohio.

13.     On January 25, 2016, Braking Point Health and Fitness, LLC, was formed in the State of Ohio.  Sheridan is the 100% owner.

14.     On March 21, 2016, Braking Point Recovery Housing, LLC, was formed in the State of Ohio.  Sheridan is the 100% owner.  This company was established for the ownership of recovery houses, also known as "sober" homes.  Sober homes are alcohol and drug-free living environments for individuals attempting to maintain abstinence from alcohol and drugs.  They offer no formal treatment, but often mandate or strongly encourage attendance at 12-step groups. According to Mahoning County Auditor, Braking Point Recovery Housing owns property at xxx Alameda Avenue, Youngstown, Ohio; and, xxx Alameda Avenue, Youngstown, Ohio.  Braking Point Residential Housing, LLC, is listed on the Auditor's website as the owner of xxx Midlothian Blvd., Youngstown, Ohio.

15.     On July 15, 2016, Braking Point Recovery Center of Central Ohio, LLC, was formed for the expansion of a new treatment facility at 4040 East Broad Street, Whitehall, Ohio. Per the operating agreement executed on August 12, 2016, Sheridan and TD each have a 50% ownership interest in Braking Point Recovery Center of Central Ohio, LLC.  On May 19, 2017,

Braking Point Physicians Care of Central Ohio, LLC, was formed in the State of Ohio for the 4040 East Broad Street, Whitehall, Ohio, location.

16.     On March 24, 2017, Braking Point Transportation Services, LLC, was formed in the State of Ohio. Sheridan is the 100% owner.

17.     On June 8, 2017, Braking Point Recovery Center of Wooster, LLC, was formed in the State of Ohio for a new office located at 230 North Market Street, Wooster, Ohio. Sheridan also formed Wooster Homeless Shelter and Felon Reintegration Program, LLC.

18.     In addition to these companies, Sheridan has also formed and solely owned the following companies for the purchase of properties, vehicles, and restaurant management: Sheridan's Cool Cars, LLC; Sheridan's Irish Pub, LLC; Sheridan Construction, LLC; Sheridan Leasing Company, LLC; Sheridan Land Management, LLC; Sheridan Property Group, LLC; Sheridan Enterprises, LLC; The Youngstown Tap House, LLC; C&S Land Holdings, LLC; 41079 Spring Hill Drive, LLC; and, 131 Commerce, LLC.

19.     In approximately December, 2016, the FBI began an investigation into Braking Point, working jointly with the United States Department of Health and Human Services, Office of the Inspector General, Office of Investigations (HHS-OIG), the Internal Revenue Service Criminal Investigations (IRS CI), the Drug Enforcement Administration (DEA), and the Ohio Attorney General's Medicaid Fraud Control Unit (MFCU). The investigation was opened based on hotline complaints from former employees of the business and the high volume of Medicaid reimbursements.

20.     Search warrants were executed on October 18, 2017, at Braking Point locations in Austintown, Ohio, and Whitehall, Ohio, as well as the personal residences of Sheridan and JMS.

## II.  Health Care Benefit Programs

21.  The term "health care benefit program," as defined in 18 U.S.C. § 24, means any "public or private plan or contract, affecting commerce, under which any medical benefit, item or service" was provided to any individual, and includes any individual or entity who provides a medical benefit, item or service for which payment may be made under the plan or contract.  The Centers for Medicare and Medicaid Services (CMS) is the agency responsible for the administration of the Medicare and Medicaid programs.

22.  Medicaid is a federal health care benefit program designated to provide medical services to certain individuals and families with low income as outlined in the Social Security Act (42 U.S.C. § 1396, *et seq*.).  Medicaid is a health care benefit program in that it is a public plan, affecting commerce, under which a medical benefit, item, or service is provided to individuals, and for which payment may be made under the plan or contract.  The United States Department of Health and Human Services (HHS) funds approximately 62 percent of Ohio's Medicaid program.  The Ohio Department of Medicaid (ODM) administers the Medicaid program in Ohio.  Ohio medical providers claim Medicaid reimbursement from ODM pursuant to written provider agreements.  ODM receives, processes, and pays those claims according to Medicaid rules, regulations, and procedures.

23.  Medicaid is a health care benefit program as defined in 18 U.S.C. § 24.  Medicaid pays health care providers, pursuant to written agreements, based on reasonable charges for covered services provided to beneficiaries.

## III.  Braking Point Medicaid Application

24.  In order to be reimbursed by Medicaid for pharmacy or medical services, a provider rendering a service to Medicaid beneficiaries must have entered into a "provider

agreement" with ODM in which the provider agreed to comply with all applicable state and federal statutes, regulations, and guidelines.

25.     As the owner of Braking Point, Sheridan entered into a contract with ODM called a Provider Agreement, in which they agreed to abide by all the rules and regulations of the Medicaid program.  This agreement allowed Sheridan to bill for medical services rendered by Braking Point to Medicaid recipients.

26.     On May 11, 2015, Braking Point submitted an application to become an Ohio Medicaid provider.  Sheridan signed the application as the "Direct Owner" and "Executive Director".  For the type of entity or practice, the application listed sole proprietorship.  The application listed the practice location as 45 North Canfield Niles Road, Suite 1000, Youngstown, Ohio 44515.  Sheridan listed on the application his convictions from 1998 through June 26, 2003, including possession of drugs, operating a vehicle impaired, domestic violence, and menacing.

27.     Specifically, on May 11, 2015, Sheridan agreed to the statement, "My electronic signature legally and financially binds this provider to the law, regulations, and program instructions of the Ohio Medicaid program.  By selecting the signature checkbox and submitting the application, I agree to abide by these terms."  Some of the terms outlined in the Medicaid application Sheridan signed are as follows:

   a.)     This provider agreement is a contract between the Ohio Department of Medicaid and the undersigned provider of medical assistance services in which the Provider agrees to comply with the terms of this provider agreement, state statutes, Ohio Administrative Code rules, and Federal statutes and rules.

   b.)     Render medical assistance services as medically necessary for the patient and only in the amount required by the patient without regard to race, creed, color, age, sex, national origin, source(s) of payment, or handicap, submit claims only for services actually performed, and bill the Department for no more than the usual and customary fee charged other patients for the same service.

9

c.)  Maintain all records necessary and in such form so as to fully disclose the extent of services provided and significant business transactions.  The provider will maintain such records for a period of six years from the date of receipt of payment based upon those records or until any initiated audit is completed, whichever is longer.

d.)  To follow the regulations and policies set forth in the appropriate edition of the Medicaid Handbook.

28.     On October 18, 2017, during the execution of the search warrants, agents interviewed Sheridan.  He acknowledged his familiarity with the application and was able to explain the above points outlined in the Medicaid application in layman's terms.

29.     Pursuant to the rules and regulations of the Ohio Medicaid Program, Medicaid only pays for services that are actually performed by qualified individuals, are medically necessary, and provided in accordance with federal and state laws, rules, and regulations.

30.     Pursuant to the rules and regulations of the Ohio Medicaid Program, Medicaid would not reimburse providers for non-covered services.

31.     In addition, pursuant to the rules and regulations of the Ohio Medicaid Program, Medicaid would not permit providers to limit housing options or selection of coverage for a Medicaid beneficiary or recipient.

32.     Pursuant to the rules and regulations of the Ohio Medicaid Program, Medicaid only reimbursed providers for mental health services if the services were provided by licensed professionals, or under the supervision of licensed professionals.

33.     Chemical Dependency Counselor Assistants (CDCAs) are regulated by the Ohio Chemical Dependency Professionals Board (OCDP Board).  Pursuant to OCDP Board rules and regulations, CDCAs can perform treatment planning, assessment, crisis intervention, individual and group counseling, case management, and education services as they relate to the abuse of, or dependency on, alcohol and other drugs.  However, to do so, CDCAs must have been supervised

10

by a licensed individual, including: an independent chemical dependency counselor, clinical

supervisor, or counselor III; a medical doctor or doctor of osteopathic medicine; a registered

nurse, or certified nurse practitioner (if within the scope of their practice); or, a professional

clinical counselor, independent social worker, or independent marriage and family therapist.

Pursuant to OCDP Board rules and regulations, CDCAs cannot practice as individual

practitioners.  OAC § 4758-6-01.

34.     Under the provider agreement with Medicaid, Sheridan agreed to bill Medicaid

only for services the provider actually rendered, were medically necessary to diagnose and treat

illness or injury, and for which the provider maintained adequate supporting documentation.  A

service or item of equipment is defined as medically necessary when provided "[f]or the

treatment of an injury, sickness, or other health condition and was: (i) appropriate and consistent

with the diagnosis or symptoms, and consistent with accepted medical standards; (ii) not chiefly

custodial in nature; (iii) not investigational, experimental or unproven; and, (iv) not excessive in

scope, duration, or intensity to provide safe, adequate, and appropriate treatment."

35.     Under the provider agreement with Medicaid, Sheridan agreed to create and

maintain documents supporting the claims Braking Point submitted, including patient medical

records, assessment and treatment records for each Medicaid beneficiary.

36.     Under the provider agreement with Medicaid, Sheridan agreed to bill Medicaid

within the benefit limits provided by ODM.  Services covered by ODM are found at

*http://www.medicaid.ohio.gov/forohioans/coveredservices.aspx.*

37.     Providers submit a claim form, normally electronically, to make claims for

payment to Medicaid.  ODM processes each health insurance claim form and issues payment to

the provider for the approved services.  As a provider, Sheridan submitted claims to ODM

11

certifying that Braking Point provided treatment that was medically necessary for the health of

the patient, provided by a qualified individual, and actually given to the patient as documented.

IV.    **Ohio Department of Mental Health and Addiction Services (OMHAS) Certification of Braking Point Facilities**

38.    Ohio Department of Mental Health and Addiction Services (OMHAS) has

statutory and regulatory authority over providers of mental health and addiction services

provided to Ohio consumers.  OMHAS licenses providers of mental health and addiction

services.  Separate standards apply depending on the type of provider and level of service

provided.

39.    A provider who wishes to obtain licensure from OMHAS must submit an

application and indicate the types of services that will be provided.  A substance use disorder

(SUD) provider must identify whether it is an "outpatient" or "residential/inpatient" provider on

the application.  An "opioid treatment program" or "OTP" is designated as an "outpatient

provider" service.

40.    In addition, an OMHAS licensed OTP must comply with all state and federal

rules and regulations.  This includes complying with all DEA requirements.

41.    On February 2, 2015, Braking Point submitted an Application for Certification to

OMHAS listing its location at 45 North Canfield Niles Road, Suite 1000, Austintown, Ohio

44515.  The Application listed Sheridan as the contact person/owner.  The application was

seeking certification of Outpatient Treatment and Prevention, and Sheridan signed it on January

29, 2015.

42.    On May 5, 2015, OMHAS certified Braking Point Recovery Center, located at 45

North Canfield Niles Road, Suite 1000, Austintown, Ohio 44515, to operate an outpatient

alcohol and drug addiction program.

43.    On September 11, 2015, Braking Point submitted a faxed application seeking certification of a detoxification program to OMHAS, and listed its location at 45 North Canfield Niles Road, 3rd Floor, Austintown, Ohio 44515. Sheridan signed this application as the "Executive Director" on September 11, 2015.

44.    On September 14, 2015, OMHAS certified Braking Point Recovery Center, located at 45 North Canfield Niles Road, Suite 1000, Austintown, Ohio 44515, to operate a detoxification program.

45.    On December 21, 2016, Braking Point submitted an application to OMHAS requesting to add a new facility at 4040 East Broad Street, Whitehall, Ohio 43213. The application listed Sheridan as the Owner and Executive Director with an e-mail contact of *emhaohio.gmail.com*. The application stated that the services to be provided at this new location were intervention, assessment, crisis management, case management, individual counseling, family counseling, intensive outpatient, urinalysis, medical somatic, sub-acute detoxification, and adjunctive alcohol and/or drug services. The date Braking Point listed as when they intended to start providing these services was January 3, 2017.

46.    On December 20, 2016, Sheridan signed the application as the owner of the Whitehall Braking Point location. Above Sheridan's signature on the application there was a declaration stating the following:

> I understand that this application, including all attachments, for Certification to provide Community Mental Health Services and activities in accordance with Ohio Administrative Code chapters 5122-24 through 5122-29 and/or Alcohol and Drug Addiction Treatment, Residential (including Halfway House), Detoxification, Driver Intervention Programs and/or Prevention services and activities in accordance with Ohio Administrative Code Chapters 3793:2-1, 3793:2-2, 3793:2-5, 3793:2-6, 3793:4 and/or 3793:5 represents our compliance with the requirements of the laws of the State of Ohio and the Ohio Administrative Code.

47.     On December 29, 2016, OMHAS certified Braking Point Recovery Center for the operation of outpatient and detoxification services at 4040 East Broad Street, Whitehall, Ohio 43213.

48.     On April 21, 2017, Braking Point submitted an application to OMHAS to provide Outpatient Treatment at 25 North Canfield Niles Road, Suite 25, Youngstown, Ohio.  On April 17, 2017, Ryan Sheridan signed this application as the Owner/Executive Director.

49.     On June 5, 2017, OMHAS received an application from Braking Point to provide Detox and Outpatient Treatment at 230 North Market Street, Wooster, Ohio.

50.     On October 18, 2017, during the execution of the search warrants, agents interviewed Sheridan and he identified his signature on all of the aforementioned applications, which were submitted to OMHAS for Braking Point Recovery Center.

**V.      Medicaid Billing**

51.     Medical providers and health care benefit programs use well-known and standard insurance processing codes to identify certain medical diagnoses and medical treatments and procedures.  The American Medical Association assigned and published five-digit codes, known as the Current Procedural Terminology (CPT) and Healthcare Common Procedure Coding System (HCPCS) codes, that identify the services rendered for which reimbursement is sought. Each CPT or HCPCS code refers to a specific service as described in their respective manuals.

52.     Medical providers record diagnoses and medical procedures on a standard claim form, which is then sent to the patient's health care benefit program.  CPT or HCPCS codes must be designated on the claim forms by the health care provider and then submitted electronically to the health care benefit program, such as Medicaid, for payment.

14

53.     Providers who seek reimbursement for providing alcohol and/or drug treatment services are required to use specific HCPCS codes related to that treatment.  For example, HCPCS Code H0016 - designated "alcohol/drug svc–medical/somatic (ambulatory setting)" - should be utilized with patients who require "medical services, medication administration services, medication assisted treatment, and the dispensing of medications in an alcohol and other drug treatment program."  OAC § 3793:2-1-08.  These services must be provided by a "physician, registered nurse or licensed practical nurse."  If provided by a LPN, the provision of medical services "shall be supervised by a registered nurse … or a physician."

54.     HCPCS Code H0006 is designated for "alcohol and/or drug services; case management."  H0006 should be utilized with patients who require assistance and support in "gaining access to needed medical, social, educational, and other services essential to meeting basic human needs."  OAC § 3793:2-1-08.  Case management does not include working out in a gym or watching movies.

55.     H0014 is designated for "alcohol/drug svc – ambulatory detoxification."  H0014 should be utilized with patients "suffering mild to moderate symptoms of withdrawal for the purpose of alcohol and/or drug detoxification."  OAC § 3793:2-1-08.  This service shall be supervised by a physician and provided by an "outpatient program that is certified by the department of alcohol and drug addiction services."

56.     H0015 is designated for "alcohol/drug svc – intensive outpatient" also known as "IOP".  H0015 should be utilized with patients receiving "structured individual and group alcohol and drug addiction activities and services that are provided at a certified treatment program site for a minimum of eight hours per week with services provided at least three days per week."  OAC § 3793:2-1-08.  The treatment program must be "certified by the department of

15

alcohol and drug addiction services."  IOP is reimbursed at a per diem/daily rate, and includes:

assessment, individual and group counseling, and crisis intervention as needed.  Therefore, other

HCPCS codes should not be billed on the same day when IOP is billed.

57.     H0005 is designated for "alcohol/drug svc – group counsel by clinician."  H0005

is utilized for patients receiving group counseling.  Group counseling shall be provided at a ratio

of no more than 12:1 (12 patients to one counselor).

58.     The procedures and services represented by HCPCS codes are health care

benefits, items, and services, within the meaning of 18 U.S.C. § 24(b).

59.     For Medicaid to reimburse a provider for the above described HCPCS codes, a

provider must be licensed appropriately by OMHAS.

60.     ODM will reimburse Medicaid providers for medically necessary behavioral

health services, such as drug addiction treatment services, provided in accordance with all

applicable state and federal regulations.  ODM created specific benefit limits, which include: a

limitation of thirty (30) hours per week of combined services (including individual counseling,

group counseling, and medical somatic); and, intensive outpatient and ambulatory detoxification

should not be billed on the same day in that ambulatory detoxification is reimbursed at a one

day/per diem rate, as is intensive outpatient treatment.

61.     ODM's benefit limits are in addition to the basic tenets of the Medicaid program

that include a service must be medically necessary, actually provided to the patient, and in

accordance with all other state and federal rules and regulations.  For example, back-to-back

drug testing without enough time for the drug to clear the individual's system is medically

unnecessary and is not reimbursable by the Medicaid program.  OAC § 5160-1-01.

16

62.     A review of Braking Point's billing illustrates that Braking Point often billed patients for IOP in conjunction with H0001 (alcohol and/or drug assessment), H0004 (behavior health counseling & treatment), H0005, or H0007 (alcohol/drug services – crisis intervention – outpatient).  In addition, Braking Point often billed patients a combination of H0004, H0005, and H0016 in excess of the 30 hour per week benefit limit.

63.     From May 12, 2015 through October 12, 2017, Braking Point submitted 134,744 claims and Medicaid paid Braking Point $31,099,469.00.  Braking Point used the same billing provider number for its locations in Austintown, Ohio and Whitehall, Ohio.  On or about October 18, 2017, Medicaid issued a notice of suspension of payments to Braking Point based upon "a credible allegation of fraud".

64.     Below is a summary of the charges Braking Point submitted to Medicaid:

| Procedure Code | Procedure | # of Claims | Billed Amount | Paid Amount |
|---|---|---|---|---|
| H0016 | Alcohol/drug svc - medical/somatic (ambulatory setting) | 28,972 | $22,952,486.28 | $15,957,148.84 |
| H0006 | Alcohol and/or drug services; case management | 35,278 | $11,649,774.35 | $6,196,515.51 |
| H0014 | Alcohol/drug svc - ambulatory detoxification | 13,454 | $3,714,507.40 | $2,600,766.05 |
| H0015 | Alcohol/drug svc - intensive outpatient program | 14,459 | $3,532,556.80 | $1,967,937.50 |
| H0005 | Alcohol/drug services - group counsel by clinician | 19,170 | $4,423,527.00 | $2,782,647.56 |

| | | | | |
|---|---|---|---|---|
| H0003 | Alcohol/drug screen- lab analysis of specimens | 10,789 | $973,868.50 | $648,870.00 |
| H0001 | Alcohol and/or drug assessment | 2,944 | $563,424.40 | $415,534.42 |
| H0007 | Alcohol/drug services - crisis intervention- outpatient | 1,675 | $314,781.80 | $221,246.09 |
| H0004 | Behavior health counseling & treatment per 15 min | 4,406 | $411,463.40 | $301,613.10 |
| J8499 | Prescription drug, oral, nonchemotherapeutic | 3,593 | $14,757.40 | $7,190.08 |
| | **TOTALS** | **134,744** | **$48,551,267.33** | **$31,099,469.15** |

## VI.    OMHAS Initial Survey of Braking Point

65.    On June 30, 2015, OMHAS performed an on-site inspection at 45 North Canfield

Niles Road, Austintown, Ohio 44515 for the initial certification of Braking Point.  Sheridan and

KG signed the attendance roster for this survey as the Executive Director and Program Director.

OMHAS found Braking Point's program treatment services supervisor did not have

documentation of regularly scheduled individual and/or group supervision sessions, developed

written goals and methods for supervision that are agreed upon with the supervisee, or

documentation of what occurred during supervision goals, as required by OAC § 3793:2-1-

5(K)(1-3).

66.    At this initial inspection, OMHAS cited Braking Point for assessment documents

that did not contain a valid diagnosis, client records did not include a diagnosis by licensed

18

individuals, as required by OAC § 3793:2-1-06(I), and the program's client records did not include an individualized treatment plan that was written within seven days of completion of the assessment or at the time of the first face-to-face contact following the assessment, as required by OAC § 3793:2-1-06(L).  OMHAS also found client's records did not include an individualized treatment plan that identified problems to be addressed, client's records did not include measurable goals, progress notes did not include content to justify the client's continuing need for services, and each service was not documented with a progress note, as required in OAC § 3793:2-1-06.

      67.     On July 6, 2015, OMHAS provided Braking Point with a Program Certification Report outlining all deficiencies, and gave Braking Point until August 4, 2015 to provide a Corrective Action Plan.  For its Corrective Action Plan to address the deficiencies, Braking Point submitted policy and procedure manual pages.

**VII.    OMHAS Site Survey of Whitehall Location**

      68.     On April 14, 2017, OMHAS performed a site survey at Braking Point's office at 4040 East Broad Street, Whitehall, Ohio.  OMHAS reviewed five charts during the survey.  The charts were found to be in serious non-compliance because they were missing key elements of the patient's assessment, lacked a proper treatment plan, did not contain case management and progress notes, did not contain drug test results, and did not contain other requirements outlined in 42 Code of Federal Regulations.  The review of client records revealed that the clinical records of clients receiving case management services did not demonstrate the assessed need for case management, and the individual treatment plans did not list case management as a service to be delivered.  OMHAS reviewed personnel files and found the files did not contain all required elements outlined in OAC § 5122-26-06.

## VIII.   OMHAS Subsequent Site Survey of Austintown Location

69.    On June 14, 2017, OMHAS performed an unannounced site survey at Braking

Point's facility at 45 North Canfield Road, Austintown, Ohio.  The survey consisted of a site

tour, interviewing patients, reviewing personnel records, and reviewing patient medical records.

This survey was conducted based on concerns Braking Point was operating 34 unlicensed

inpatient beds

70.    On January 21, 2016, OMHAS received an application seeking certification of a

residential treatment facility at 45 North Canfield Niles Road, Suite 1000, Austintown, Ohio

44515.  Sheridan listed himself as the Owner/Executive Director.  KG was listed as a point of

contact.  Dr. VM was listed as the Medical Director, and Dr. AS was listed as the Acting Medical

Director.  According to OMHAS surveyors, Braking Point verbally requested the application for

residential beds be withdrawn, but did not submit a formal written request.

71.    Sheridan and KG gave the OMHAS surveyors a tour of the facility.  The facility

consists of a large building with three floors.  The third floor has a reception area and

administrative offices.  KG showed the surveyors his/her office and Sheridan's office on this

floor.  Sheridan showed the surveyors a file room.  The file room had shelves with paper chart

notes in manila folders and boxes filled with paper.  In the middle of the file room, the surveyors

observed a table containing a stack of papers about 2-3 feet high.

72.    As part of the tour, the surveyors saw the second floor of 45 North Canfield Road.

The second floor is used for outpatient day treatment for transitional clients.  Sheridan told

surveyors he owns a recovery house called "Midlothian."  Patients are placed at Midlothian after

detox and are transported to Braking Point in vans.  Sheridan stated Braking Point pays for the

patient to stay at Midlothian for one month.

20

73.     Sheridan also showed the surveyors the first floor at Braking Point. The first floor has a detox unit with 16 beds, and a supplemental unit with 34 beds.

74.     The OMHAS surveyor interviewed patient "E", who was in transitional treatment. "E" told the surveyor he/she was in detox for five days and, then, placed in a supplemental bed for 1½ weeks. "E" complained that supplemental treatment was crowded and there were no individual sessions. "E" lives at Midlothian and is transported by van to Braking Point where he/she attends Intensive Outpatient Therapy (IOP) three days a week for three hours.

75.     The OMHAS surveyor interviewed patient "J", who was in the supplemental unit. "J" told the surveyor he/she had been to Braking Point four or five different times for treatment. "J" was in detox for seven days and will be in residential for 28 days. "J" is receiving Suboxone, which is a Schedule III buprenorphine drug used to treat drug addiction.

76.     The OMHAS surveyor interviewed "C". "C" told the surveyor Braking Point will pay for him/her to stay one month at Gypsy Place, another sober house, if he/she completes the 28-day supplemental treatment. Braking Point will transport "C" to Braking Point for treatment and doctor's appointments.

77.     During this June 14, 2017 site survey, OMHAS reviewed charts and found many of the case management notes did not have a credentialed supervisor signing off on the notes. Some of the case management notes were for questionable treatment, including working out at a gym and a counselor buying a patient's cigarettes. Additionally, OMHAS found group notes did not have the patient's name on the top, and it appeared Braking Point put the same note in all the group participants' charts. The charts reviewed by OMHAS had no documentation about the level of care patients need. The assessments of the patients were not completed properly and goals were very generic. The treatment plans did not outline frequency of treatments. The chart

21

notes showed unqualified employees diagnosing patients.  Crisis intervention notes written in the charts were for issues that do not qualify as crisis.

78.     The Medicaid billings for patient CK have been reviewed.  CK was interviewed by OMHAS surveyors on June 14, 2017.  Patient CK told OMHAS that in January 2017 patient CK was in detox for seven days at Braking Point.  After completing detox, Braking Point placed CK in the 28-day inpatient supplemental program.  CK then lived at a sober living house for three months.  On April 15, 2017, CK relapsed and was re-admitted to Braking Point.  According to Medicaid billing data, CK had billings for detox for seven days and for the inpatient 28-day supplemental.  From January 11, 2017 through February 13, 2017 (excluding January 20, 2017), Braking Point received $34,914.00 for the treatment of patient CK.  The analysis of patient CK's Medicaid billing shows Braking Point is billing Medicaid for 28 days of treatment in unlicensed beds.

79.     Braking Point was not permitted to operate as a residential facility, because they failed to obtain the appropriate licensure through OMHAS.  Since OMHAS' site survey revealed Braking Point was operating as a residential facility in an unlicensed capacity, ODM would not reimburse for services provided to Medicaid patients.

## IX.     Services Billed By Braking Point Not Supported

80.     As part of the investigation, state and federal agents interviewed former employees of Braking Point.  These former employees provided the information summarized below about the operation of the company and services provided.

81.     Employee 1 provided the following information:

a.)     Sheridan had been a business partner of Scotchie and Associates, which provided addiction counseling services and drug testing for individuals ordered by a court to receive

22

treatment.

b.)     Sheridan planned for Braking Point to expand and fill up the space of Scotchie and Associates, which was a three-story former hospital.  Braking Point had 16 detox beds on the first floor, outpatient services on the second floor, and the third floor has administrative space.

c.)     Sheridan paid to have the facility at 45 North Canfield Niles Road remodeled.  On April 13, 2016, Sheridan opened the new residential unit.  Sheridan told Employee 1 Braking Point had to be approved by OMHAS to be paid by Medicaid for detox services.  Sheridan told Employee 1 that he was not going to get a license to have residential beds because Braking Point was not charging patients for the beds.

d.)     When Sheridan opened the Braking Point facility in Whitehall, Sheridan put TD in charge of this facility.  TD's brother, JD, operates sober living houses in the Warren/Youngtown area.

e.)     The billing at Braking Point was very secretive.  Employees provided daily billing sheets to JMS.  These sheets would include the client's name, client's number, services provided, the start time, and duration of the services.  The services marked on these sheets included case management, group, or crisis intervention.

f.)     Case notes were written by hand and were supposed to be completed within 72 hours.  The case managers at Braking Point were behind in their notes, and supervisors had to sign as many as 400 notes a day.  A patient's Individualized Treatment Plan (ITP) must be completed within three days of a patient being brought into detox, and these ITPs were not being done at Braking Point.

g.)     The file room at Braking Point was on the third floor and was in disarray.  The file room had a table with piles of charts and stacks of notes.  Files were not complete and they contained blank releases of information.

h.)     Braking Point far exceeded the 1:12 ratio required for outpatient groups.  An employee began questioning and pointing out to Sheridan and KG that there were too many people in groups.

82.     Employee 2 provided the following information:

a.)     Sheridan was the owner and JMS was responsible for billing at Braking Point.

b.)     Clients in the residential program stayed at Braking Point for approximately 28 days.

c.)     Counselors were behind on their group notes most of the time because of the volume of patients.  Counselors would run five group sessions in one day, which equated to counselors having to prepare approximately 60 or more individual notes for one day.

d.)     Each client had a chart, but there was not much in the charts.  The notes that should have been in the chart were not filed in the charts.  A counselor brought his/her concerns about missing notes to LC (the Clinical Director and Compliance Officer) and was told the notes would be filed.  Employee 2 felt no one at Braking Point seemed to be in charge of putting charts together.  Braking Point never did internal audits and there was no concern over missing notes.  There would be piles of notes stacked in the office, but Employee 2 never saw a note he/she prepared in a chart.  Assessments and Plans of Care were not in the charts as required.  Braking Point clients had Individual Service Plans (ISPs) done when they had their assessments completed, but Employee 2 stated they seemed generic.

24

e.)      Although Employee 2 did not have his/her chart notes completed, Employee 2 was required to turn in his/her time sheets every day.  Employee 2 heard that Braking Point billed off the time sheets regardless if there was a note to support the billing.  There were times when patients in the residential program would finish their 28 days of treatment and notes were still not completed.  Employee 2's timesheets contained the time of the group and a list of who attended.  Braking Point had high employee turnover and these staff would leave without completing their notes.

f.)      A counselor talked to LC about the notes, and LC stated he/she told JMS about the notes being so far behind.  Notes were a month to two months behind, even though they are supposed to be completed within 72 hours of a counseling session.

g.)      Braking Point did not do any type of drug testing or criminal history checks when employees were hired.

83.    Employee 3 provided the following information:

a.)      Braking Point had a poor employee handbook, there was no training for employees, no HIPAA officer, no training regarding HIPAA, no authorization to release information that met government requirements, and employees were not given policies and procedures.

b.)      Braking Point employees had personnel files, but they were lacking required information.  Employees did not have to have a drug screening or criminal history background checks, the HHS exclusion database was not checked, and fingerprints were not checked.  An employee spoke to Sheridan about the lack of chart auditing and HIPAA training.

c.)     Management at Braking Point was afraid of an audit because there were no notes to support billings and the charts were a mess.  LC, Sheridan, JMS, and KG talked all of the time about the notes being behind.

84.     Employee 4 provided the following information:

a.)     Braking Point had a Director of Housing, who reviewed the client's financial situation, determined if he/she was receiving Social Security, and evaluated the client's family situation in order to assist the client with housing.

b.)     If the 36 bed supplemental unit was full, clients were placed in transitional houses known as sober houses.  Braking Point transported clients from sober houses to Braking Point for classes.  The typical day for an individual in transitional housing started at approximately 7:00 a.m., when Braking Point transported the patient to the facility for breakfast.  The client then had a daily average of six to eight hours of classes.  Clients were provided lunch and dinner and, then, transported back to their sober house.

c.)     Sheridan owned the gym that was located inside of Braking Point and all clients were required to go to the gym for a consultation and would work out for 60-90 minutes.

d.)     JMS was the only billing person at Braking Point.  JMS billed from home and sent e-mails to employees when she was at home.

e.)     Braking Point's residential daily schedule was a generic schedule of the groups being held and the times.  JMS only cared about the billing sheets and did not care about the case management notes.  Billing sheets were handwritten.  JMS told employees to bill in minutes and hours and not to use the actual times of the services.  A client could be signed into a group for billing purposes and, then, leave for an individual counseling session, a crisis intervention, to go to the gym, or a smoke break - all while being recorded for billing as sitting in the group session.

26

f.)     The patient charts are not organized, and it would be very difficult to find a complete chart.  It was very hard to treat patients at Braking Point because you were unable to refer to a chart to see the patient's history or assessment.

85.     Employee 5 provided the following information:

a.)     JMS is solely responsible for doing the insurance billing at Braking Point. Counselors sent their timesheets to JMS daily and these timesheets were used for billing. Braking Point is constantly drug-testing patients in order to bill for that service.

b.)     Sheridan had an expectation of making $100,000.00 a week.  Sheridan would scream at JMS if Braking Point only made $50,000.00.  Braking Point expected their counselors to have so many billable hours.  KG was responsible for making sure counselors met their billable hours.  JMS checked daily to make sure counselors turned in their timesheets.  JMS was not concerned if counselors had patient chart notes turned in, and was only concerned about being able to bill from the timesheet.

c.)     Braking Point is operating inpatient beds without the proper license.  Sheridan stated he had a work around to be able to have these additional inpatient beds.

d.)     Employee 5 stated AS, VM, and TB were medical doctors at Braking Point.

86.     Employee 6 provided the following information:

a.)     Employee 6 explained the progression of a patient through Braking Point.  The detox program has 16 beds, and lasts for seven days for drug detox and five days for alcohol detox.  After detox, clients move to the supplemental program.  The supplemental is a 28-day program where clients stay at Braking Point for 24 hours a day.  Clients go to group and individual counseling as well as to the gym.

27

b.)     After supplemental treatment patients go to day treatment. This program runs Monday through Friday from 9 a.m. – 5 p.m. for ten days. If a client lives at a sober house while in day treatment, Braking Point's vans transport the clients to and from treatment.

c.)     Following day treatment, the client moves to the Intensive Outpatient Program (IOP). IOP is for eight weeks. After IOP, clients go to after care. During after care, clients go to Braking Point one day a week for two hours.

87.     Employee 7 provided the following information:

a.)     At the end of each day, Employee 7 turned his/her time sheets into JMS with the name of each client seen that day, the type of service, and the times the client was seen. Patient notes were not attached to the billing time sheets. Braking Point required employees to turn in the billing time sheets even if the notes were not done. Notes were always months and months behind because Braking Point is too short-staffed, and there are too many groups. Employee 7 never received training on preparing notes or guidance on what was a billable service.

b.)     Clients at Braking Point start out in the detox program for seven days, then go to residential for around 30 days, then day treatment for 10 days, then IOP for six to eight weeks, and finally aftercare for another six to eight weeks.

c.)     Employee 7 stated Sheridan spent a lot of money on the gym at Braking Point. Patients left group sessions for personal training. Employee 7 saw stacks of papers for the gym trainers that appeared to be billing sheets.

d.)     Employee 7 transferred from Austintown to Braking Point's Whitehall location. When Whitehall opened, nothing was organized. The Whitehall location had a 16 bed detox program, day treatment program, but no residential or IOP.

28

88.    Employee 8 provided the following information:

a.)    Employee 8 worked at Braking Point's Whitehall location.  Employees from Braking Point's Austintown location came to Whitehall three or four times for "billing meetings".  After these meetings, there would be some type of change implemented, and the billing sheet would be changed.

89.    Employee 9 provided the following information:

a.)    Employee 9 was employed at Braking Point's Whitehall location in the nursing department.  TD and LP interviewed Employee 9.  TD introduced himself as the owner, and LP stated he/she was the CEO and attorney for the office.  TD stated that Ryan Sheridan owns the Austintown location, and Ryan Sheridan is TD's partner at Whitehall.  Braking Point was 100% Medicaid.

b.)    When Employee 9 started at Braking Point, TD and LP stated that all nursing staff, including supervisors, were expected to bill 120 minutes per patient for the 16 patients in detox during his/her 12-hour work shift.  In total, all detox patients were to be billed 240 minutes of medical somatic a day.

c.)    Employee 9 was in a meeting with TD, LP, another person, Ryan Sheridan, and JMS.  Ryan Sheridan and JMS attended by telephone.  The Austintown location sent Whitehall a list of items that needed correction.  During this meeting, the White Hall location was reprimanded for nurses not meeting their billing quota.

d.)    TD told Employee 9 that obtaining 120 minutes of billable medical somatic was easy.  TD said to go smoke with the patients, sit with them in the TV room, and check to see if patients were in their bed.  Since it was impossible to obtain 120 minutes for each patient, TD

said to count discussion with a group of patients as medical somatic. TD said a patient should be discharged if the timesheet did not have 120 minutes.

e.) Employee 9 would check off on his/her timesheet med somatic, passing out medication, taking vitals, checking to see if patient is sleeping in their bed and stable, patient education, and drug testing.

f.) LP, TD, Sheridan and JMS were e-mailed daily a spreadsheet summarizing the nurse billings for the day. TD reviewed these reports and would call if a patient had less than 120 minutes.

g.) Patients at White Hall were excessively drug tested, including those in an inpatient program. This is worthless because the patients attending the 28-day program were supposed to be monitored by a Braking Point employee 24 hours a day.

90. Employee 10 provided the following information:

a.) Nurses worked straight from treatment protocols based on the patient's addiction, including the "Opiate Withdrawal Protocol." Dr. TB would sign the "Opiate Withdrawal Protocol" at the bottom of the form. Nurses would give patients Suboxone as indicated on the protocol prior to patients being seen by a doctor. Nurses would only contact the doctor if a patient needed additional Suboxone. Braking Point did not have a policy that a patient had to be seen by a doctor within the first 24 hours. Sometimes patients would be in the detox unit for 48 hours without seeing a doctor. In one instance, a patient was in the detox unit for 5 days without seeing a doctor.

b.) Anytime Suboxone was given, nurses recorded the dispensing in the "Narc log". The night shift had to turn a copy of the "Narc Log" into JMS' mailbox.

c.)      Nurses were given a form to use in the residential/supplemental unit.  The form listed the patients' names and contained a column for vitals and a column for PRNs.  (PRNs are medications administered per the protocol.)  JMS wanted this form completed for the patients in supplemental and placed in her mailbox daily.

d.)      In Carelogic, nurses had to chart all activities under a section called Med Somatic. Employee 10 did not know what med somatic meant.

e.)      Patient's whereabouts needed recorded by nurses on an "Hourly Check" form. When Carelogic started being used, management wanted bed checks recorded in the system every hour.  A nurse would walk around the unit, while the patients were sleeping, and shine a pen light on them.  Employee 10 would divide the number of occupied beds in detox by 60 minutes to determine how much time he/she recorded for each patient's bed check.

91.     Employee 11 provided the following information:

a.)      Employee 11 had conversations with Sheridan about how controlled narcotics were being dispensed.  Sheridan told Employee 11 not to worry about it.  Employee 11 responded that it was a big deal because you are passing out medication.

b.)      JMS was overlapping billing time for group therapy with times patients were receiving medication.  Employee 11 told JMS that you cannot bill for a patient being in group when they are absent getting their medication.

c.)      The nurses would start a patient on a drug protocol.  Patients would be given medication, to include Suboxone, off this protocol on day one, prior to seeing the doctor.  The doctor was only called if there was something abnormal.

d.)      Dr. AS was rarely at the facility and Dr. TB saw the patients.  Dr. AS came only if Dr. TB was out.  Dr. TB would sign the orders for medication.

31

e.)     Employee 11 was aware that Dr. TB did not have the appropriate authority to dispense narcotic drugs for addiction treatment under DATA 2000.  Employee 11 asked JMS how Dr. TB was allowed to sign Suboxone orders.  JMS replied that technically the Suboxone is ordered under Dr. AS, but Dr. TB was just signing off.

f.)     JMS did all the medical billing and ordering of medication.

g.)     JMS told the nursing staff to take vitals every shift so it could be billed. Employee 11 felt there was no reason to take a patient's vitals if he/she was stable and not on blood pressure medication.

92.     Employee 12 provided the following information:

a.)     Braking Point had a 36 bed residential unit.  KG told the nurses at a meeting to stop calling this unit residential.  KG stated residential implied the patient was living at Braking Point.  KG wanted the 36 beds called "supplemental" because she said Braking Point was providing a service to patients.

b.)     JMS would give the nursing director orders to pass down to nurses.  Nurses were told to record no less than five (5) minutes for any activity.  Employee 12 stated it did not take five minutes to administer an ibuprofen.  Nurses were told to take a patient's vitals every time they administered any medication.

c.)     After Carelogic started, JMS stated that Braking Point would go under if nurses did not start billing more.  In Carelogic, nurses recorded all of their activities in a section called "med somatic."

d.)     In Carelogic, Braking Point staff was supposed to record events in real time. Nurses would try to record giving a patient a medication at the actual time but could not because Carelogic showed the patient as being in a group.  Nurses had to find open time in Carelogic to

record the dispensing of medications.  As such, Carelogic did not accurately reflect a patient's care.

e.)     Nurses knew Dr. TB was not a DATA waive physician.  It was understood that Dr. AS would be responsible for the prescriptions, but Dr. TB would actually be treating the patients.  Dr. TB did not take the extra educational classes to obtain a DATA certification.  Dr. AS was the only doctor at Braking Point authorized to write Suboxone prescriptions.

93.     Employee 13 provided the following information:

a.)     Dr. TB saw patients and signed off on Suboxone and Vivitrol orders for inpatient clients.  Dr. TB was at Braking Point a couple times a week and signed all inpatient medication orders.

b.)     Braking Point had a detox program and a 28-day residential treatment program.  The term "residential" was switched to "supplemental."  KG yelled at employees and said to call the program supplemental.  KG said there was a billing reason why the program needed to be called "supplemental."  The treatment remained the same and did not change with the terminology.  JMS also said to call the program supplemental.

c.)     Nurses were given a form to use in the residential/supplemental unit.  The form listed the patients' names and contained a column for vitals and a column for PRNs.  Employee 13 learned that the form was used for billing by JMS for med somatic.  JMS would bill for taking vitals.  If the sheet was not filled out, JMS would say that she needed the form for billing.

d.)     When Braking Point switched to computerized medical records in Carelogic, JMS got angry at the nursing staff for not billing for 15 minutes for doing a client's vitals and another 15 minutes for administering medication.  JMS said that anything the nursing staff did should be

billed in 15 minute increments using the med somatic code.  Employee 13 advised it took

him/her only two minutes to do vitals even though he/she was told to bill for 15 minutes.

      e.)     When Braking Point started with Carelogic, JMS wanted the nursing staff to bill

for med somatic for each hourly bed check.

      f.)     JMS gave the nursing staff a quota for billing after Carelogic was implemented.

JMS wanted the nursing staff to bill 4-6 hours of nursing care per client per day.

## X.    Interview of JMS on October 18, 2017

      94.     On October 18, 2017, JMS was interviewed by FBI Special Agents.  The

interview was conducted in conjunction with the execution of search warrants at her residence

and at the Braking Point facilities in Austintown, Ohio.  Among other things, JMS stated the

following:

      a.)     JMS handled billing at Braking Point.  JMS has been with Braking Point since its

inception in 2015.  KG, JMS, and Ryan Sheridan were the primary individuals that decided to

open Braking Point.

      b.)     At the beginning of Braking Point, all of the employees kept their own logs and

sign in sheets.  JMS billed Medicaid based on the information on these sheets.  JMS explained

that there were only ten (10) codes that she could bill and that they were basic codes from

Medicaid.  JMS stated that there is a code book that explained the billing codes.  There are also

explanations on the Medicaid website.  Ryan Sheridan received training when he was certified

through the state.

      c.)     Braking Point had 16 detox beds.  After detox, clients went to supplemental

living.  JMS did not know why they did not call this inpatient treatment.  It was called

supplemental because it was in addition to detox.  All services in supplemental living were considered outpatient.  Ryan Sheridan handled all of the certifications for Braking Point.

d.)     Braking Point had two doctors.  Dr. AS handled the Medical Assisted Treatment Program.  Dr. AS was supposed to be at Braking Point once a week.  It then became twice a month.  Nurses would contact a doctor if there were issues with a client.  There were standard protocols in place for what medicines were to be given.  JMS ordered Suboxone from Barry's Pharmacy.  JMS advised that Braking Point had a standing order.

e.)     Dr. TB also worked at Braking Point.  Dr. TB worked three days a week, and did histories and physicals with clients.

f.)     Nurses made a log sheet of medicine administered.  This log sheet documented their time spent with the client.  JMS billed Medicaid based on the log sheets and sign-in sheets. With regard to the medical somatic codes, JMS stated: "We encouraged them to bill as much time as they could because the clients were sick."

g.)     When clients went to the gym, JMS billed for case management.  Ryan Sheridan told JMS to bill this time as case management.  Braking Point had organized classes for spinning and yoga.

h.)     Braking Point stopped using paper charting and began using electronic charting in approximately May of 2017.  JMS stated that billing for the medical somatic code dropped with the change to electronic charting.  JMS stated that Braking Point was not getting the money they used to get.  JMS said that Braking Point nurses had to increase their medical somatic time.

i.)     After Carelogic was implemented, JMS estimated that Braking Point's billing reimbursement per the medical somatic code dropped by approximately $50,000 - $100,000 per week.  Nurses had a hard time scheduling patients and were not able to document the time spent

with patients. Ryan Sheridan noticed that the medical somatic time dropped because the money dropped. JMS texted Ryan Sheridan about the drop in the medical somatic billing. Ryan Sheridan told JMS that Braking Point was going to go bankrupt. Before electronic charting, JMS billed more for medical somatic and not as many group codes. Medical somatic paid more.

## XI.    Braking Point's Narcotic Treatment Program and DEA Inspection of Dr. AS

95.    On September 27, 2017, the DEA Diversion Unit conducted a regulatory inspection on Dr. AS at his registered location of 45 North Canfield Niles Road, Austintown, Ohio to review Dr. AS's prescribing of buprenorphine products for drug addiction treatment. When the DEA arrived at Braking Point for this inspection, the receptionist stated Dr. AS was in Utah. JMS met with the DEA Diversion Agents, and told them she is in charge of billing at Braking Point. JMS stated Braking Point operates a 16-bed detox unit. According to JMS, Braking Point patients are 100% Medicaid because it is too difficult to handle private pay and commercial insurance. JMS stated Braking Point provides free on-site housing for patients attending Braking Point's supplemental treatment program. JMS stated Dr. AS is at the facility two times a month, and has standing orders on the medication to be dispensed to patients. JMS stated Braking Point uses an electronic medical system for patient charts.

96.    On October 3, 2017, DEA investigators met with Dr. AS to conduct an inspection. During the inspection, Dr. AS was asked to discuss how the detox program works, and Dr. AS stated that when patients enter the program they are evaluated by a physician the same day or the day after. Dr. AS stated that on first arrival the patient is evaluated by a nurse, and vitals and medical history are taken. Dr. AS said the program has two paths, one for alcohol addiction treatment and one for opioid addiction treatment, and then discussed the opioid addiction protocol. Dr. AS stated that the patient gets a tapered dose of Suboxone during the entire seven

36

to nine day stay. Every day the nurse checks the patient and, if the patient has complaints, they call Dr. TB and discuss the patient's status. (Dr. TB was another physician at Braking Point.) Dr. TB then addresses the patient's concerns, mostly attempting to keep the patient comfortable during the withdrawal. According to Dr. AS, Dr. TB will come in almost every day and see the patient.

97.     Dr. AS stated "I rarely see patients in detox", adding that new patient intakes are seen by Dr. TB. Dr. AS was asked if Dr. TB sees the patient and writes the order for Suboxone. Dr. AS stated that "no, we have a standing order. We have a protocol that folks will follow and he (Dr. TB) will sign off on it." Dr. AS was asked if Dr. TB would make the determination if Suboxone is appropriate for the patient and Dr. AS answered "absolutely".

98.     Dr. AS was asked if Dr. TB is determining the dose or just signing off on whether or not the detox patient can start the protocol. Dr. AS stated, "We don't customize anything for anybody", and commented that "it's not like I used this much more heroin than this guy did so I get more". Dr. AS then said again that there's no customization, and added "it's like this is what you get." Dr. AS stated that he/she understood that he/she is responsible for all of his/her Suboxone purchases, and stated he/she was very comfortable with Dr. TB dispensing from his/her supply.

99.     Braking Point  had a wholesale account to order medications with Berry's Pharmacy in Austintown, Ohio. The account was established via a fax from KG sent on September 10, 2015. On the fax, KG provided Dr. AS's DEA registration number along with Braking Point's terminal distributor license from the Ohio Board of Pharmacy. JMS at Braking Point would order Suboxone and Librium from Berry's Pharmacy via a telephonic order every week or two. Checks issued by Braking Point to pay Berry's Pharmacy were signed by Ryan

Sheridan.  The pharmacists at Berry's Pharmacy had never spoken to Dr. AS nor had Dr. AS come into the pharmacy to place an order.  When interviewed, Dr. AS stated he/she was unaware his/her DEA registration number was being used to order medications, including Suboxone, and did not authorize its use.

100.    The Controlled Substances Act and its implementing regulations require a separate registration for each principal place of business or professional practice at one general physical location where controlled substances are manufactured, distributed, imported, exported, or dispensed.  Every practitioner (individual or institutional) that dispenses or proposes to dispense a controlled substance for maintenance or detoxification treatment must obtain a DEA registration as a Narcotic Treatment Program.

101.    On October 17, 2000, Congress passed the Drug Addiction Treatment Act of 2000 (DATA 2000) which authorized qualified physicians, after receiving a waiver from the Substance Abuse and Mental Health Services Administration, to treat patients with opioid addiction with FDA approved buprenorphine products such as Suboxone, a Schedule III controlled substance, in an office setting.  The DATA 2000 legislation waived the requirement for obtaining a separate DEA registration as a Narcotic Treatment Program for qualified physicians administering, dispensing, and prescribing these specific FDA approved controlled substances.  DATA 2000 authorized qualified physicians registered with the DEA as practitioners to obtain a waiver, which would then authorize them to conduct maintenance and detoxification treatment using specifically approved Schedule III, IV, or V narcotic medications.  Only qualified physicians are allowed to prescribe, administer, or dispense narcotic drugs for the treatment of opioid addiction.

102.    Dr. AS was the only DEA registrant at Braking Point with a DATA waiver.  Since Dr. AS was not making the medical determination for the buprenorphine (including Suboxone) orders, then neither Braking Point nor any other practitioner was authorized - by waiver or registration - to order, administer or dispense buprenorphine products for detoxification of narcotic dependent patients.

## FINANCIAL INFORMATION

**Bank Account 1**

103.    On December 18, 2014, Sheridan opened a bank account at Talmer Bank and Trust, now known as Chemical Bank, in the name of Braking Point Recovery Center, LLC, ending in xxx1207 (Bank Account 1).  Sheridan is a signer on the account, along with KG starting in August 2015.  Approximately $11,877,178.56 was deposited into Bank Account 1 between December 2014 and May 2017, which consisted of the following:

a.)    From June 2015 through July 2016, Bank Account 1 received approximately $5,805,562.91 in electronic payments from the Ohio Department of Medicaid.

b.)    From July 2016 through May 2017, Bank Account 1 received approximately $5,067.494.36 in transfers from Bank Account 2, which is described below.

**Bank Account 2**

104.    On June 24, 2016, Sheridan opened a bank account at Talmer Bank and Trust in the name of Braking Point Recovery Center, LLC, ending in xxx1090 (Bank Account 2). Sheridan is the only signer on this account.  Approximately $23,260,148.55 was deposited into Bank Account 2 between June 2016 and May 2017, which consisted of the following:

a.)    From July 2016 through May 2017, Bank Account 2 received approximately $16,669,547.12 in electronic payments from the Ohio Department of Medicaid.

b.) From July 2016 through April 2017, Bank Account 2 received approximately $467,526.89 in transfers from Bank Account 1.

c.) From September 2016 through May 2017, Bank Account 2 received approximately $6,072,919.96 in transfers from Bank Account 3, which is described below.

**Bank Account 3**

105. On June 13, 2016, Articles of Organization for Sheridan Enterprises, LLC, were filed with the Ohio Secretary of State. On July 19, 2016, Sheridan opened a bank account at Talmer Bank in the name of Sheridan Enterprises, LLC, ending in xxx2720 (Bank Account 3). Sheridan is the only signer on this account. Approximately $14,949,765.82 was deposited into Bank Account 3 between July 2016 and May 2017, which consisted of the following:

a.) From July 2016 through May 2017, Bank Account 3 received approximately $13,997,715.88 in transfers from Bank Account 2.

b.) On January 20, 2017, approximately $525,000.00 was transferred into Bank Account 3 from a line of credit taken out by Sheridan at Chemical Bank.

c.) On April 14, 2017, a check in the amount of approximately $310,000.00 was deposited into Bank Account 3. The check was drawn on Bank Account 8 described below.

**Bank Account 4**

106. On March 1, 2010, Sheridan opened a bank account at First Place Bank, in his own name ending in xxx2710 (Bank Account 4). Sheridan is the only signer on this account. The bank balance as of December 31, 2015 was approximately $1,252.52. Approximately $3,265,872.00 was deposited into this account from January 2016 through May 2017, which consisted of the following:

40

a.)     From March 2016 to July 2016, Bank Account 4 received at least $2,365,643.00 in transfers from Bank Account 1.

b.)     From August 2016 through April 2017, Bank Account 4 received at least $750,000.00 in transfers from Bank Account 3.

c.)     On June 28, 2016, Bank Account 4 received approximately $100,000.00 via a transfer from Bank Account 6, which is described below.

**Bank Account 5**

107.    On August 27, 2016, Sheridan opened a bank account at Talmer Bank and Trust in his own name ending in xxx5356 (Bank Account 5).  Sheridan is the only signer on this account.

a.)     From September 2016 through April 2017, Bank Account 5 received at least $3,700,000.00 in transfers from Bank Account 3.

b.)     From October 2016 through May 2017, checks from Bank Account 1 totaling approximately $186,073.96 were deposited into Bank Account 5.

**Bank Account 6**

108.    On January 19, 2016, Sheridan opened a bank account at Talmer Bank and Trust in the name of Braking Point Recovery Center, LLC, dba Braking Point Drivers Intervention Program ending in xxx1605 (Bank Account 6).  Sheridan, KG, and PB were all signers on the account until August 2016, when PB was removed as a signer.  As of June 23, 2016, the balance of Bank Account 6 was $6,223.96.  Thereafter, on June 24, 2016, Bank Account 6 received $100,000.00 via transfer from Bank Account 1, which was transferred to Bank Account 4 on June 28, 2016.

41

**Bank Account 7**

109.     On April 18, 2017, Sheridan opened a bank account at Huntington National Bank in the name of Sheridan Enterprises, LLC, ending in xxx3545 (Bank Account 7).  Sheridan is the sole signer on the account, and Sheridan is listed as the sole member of Sheridan Enterprises, LLC.  Approximately $5,591,949.13 was deposited into Bank Account 7 between April 18, 2017 and August 16, 2017, which consisted of the following:

a.)     From May 2017 through August 2017, Bank Account 7 received approximately $3,981,838.12 in transfers from Bank Account 8, which is described below.

b.)     On May 25, 2017, Sheridan wire transferred approximately $500,000.00 into Bank Account 7 from Bank Account 2.

c.)     On June 2, 2017, Sheridan wire transferred $500,000.00 into Bank Account 7 from Bank Account 2.

d.)     On April 28, 2017, Sheridan wire transferred approximately $20,000.00 into Bank Account 7 from Bank Account 3 and, on May 18, 2017, Sheridan wire transferred approximately $500,000.00 into Bank Account 7 from Bank Account 3.

e.)     On July 18, 2017, a deposit of $90,070.04 was transferred into Bank Account 7 from an account for which supporting documentation has not yet been received.

**Bank Account 8**

110.     On January 25, 2017, Sheridan opened a bank account at Huntington National Bank in the name of Braking Point Recovery Center, LLC, ending in xxx4279 (Bank Account 8). Sheridan is the sole signer on the account, and Sheridan is listed as the president, owner, and CEO of Braking Point Recovery Center, LLC.  Approximately $6,288,359.27 was deposited into Bank Account 8 between January 2017 and August 2017, which consisted of the following:

a.)     From June 2017 through August 2017, Bank Account 8 received approximately

$4,428,007.06 in nine electronic payments from the Ohio Department of Medicaid.

b.)     From May 2017 through August 2017, Bank Account 8 received approximately

$1,063,177.27 in transfers from Bank Account 7.

c.)     From April 2017 through May 2017, Bank Account 8 received approximately

$490,000.00 in transfers from Bank Account 3.

d.)     On May 10, 2017, Bank Account 8 received approximately $175,000.00 via a

transfer from Bank Account 2.

e.)     On May 24, 2017, Bank Account 8 received approximately $80,000.00 via a

transfer from Bank Account 9, which is described below.

**Bank Account 9**

111.    On April 17, 2017, Sheridan opened a bank account at Huntington National Bank

in the name of Braking Point Recovery Center, LLC, ending in xxx3480 (Bank Account 9).

Sheridan is the sole signer on the account, and Sheridan is listed as the sole member of Braking

Point Recovery Center, LLC.  Approximately $1,780,530.48 was deposited into Bank Account 9

between April 2017 and August 2017, which consisted of the following:

a.)     From May 2017 through August 2017, Bank Account 9 received approximately

$1,189,239.62 in transfers from Bank Account 7.

b.)     From May 2017 through August 2017, Bank Account 9 received approximately

$590,863.88 in transfers from Bank Account 8.

**Transactions in Excess of $10,000.00 Conducted by Ryan Sheridan.**

112.    Sheridan conducted numerous transactions in excess of $10,000.00 using funds

from bank accounts that were funded, either directly or indirectly, by the Ohio Department of

Medicaid.  These transactions include the following:

      a.)      On May 16, 2016, Sheridan purchased a cashier's check from Bank Account 1 for $29,114.25 payable to Metro Land Title Agency.  Mahoning County property records show that on May 19, 2016, Braking Point Recovery Housing, LLC, acquired the title to a property located at xxx Alameda Avenue, Youngstown, Ohio for $29,000.00.

      b.)      On July 12, 2016, Sheridan wired $22,500.00 from Bank Account 4 to an individual in Israel with the initials "A.F.".  Sheridan stated on the Foreign Transfer Request that funds were for the purchase of an Omega watch.

      c.)      On August 3, 2016, Sheridan wired $51,300.00 from Bank Account 4 to Paul Casey Entertainment to purchase the defendant 1981 DeLorean DMC Gullwing, Vehicle ID Number: SCEDT26T1BD006297.  The vehicle is a Hollywood reproduction of the vehicle featured in the movie "Back to the Future".  Title information from the Ohio Bureau of Motor Vehicles shows that the vehicle is currently titled to Sheridan's Cool Cars, LLC.

      d.)      On August 3, 2016, Sheridan withdrew $92,556.11 from Bank Account 3, which he converted to a cashier's check payable to Cole Valley Motors.  Records from Cole Valley Motors confirm that on August 3, 2016, Sheridan purchased the defendant 2016 Cadillac Escalade ESV, VIN: 1GYS4JKJ8GR403801, with this cashier's check.  Title information from the Ohio Bureau of Motor Vehicles shows that the vehicle is titled to Braking Point Recovery Center, LLC.

      e.)      On August 25, 2016, Sheridan withdrew $100,000.00 in currency from Bank Account 4.  When asked by bank employees if he would accept the cash in another form, Sheridan stated he wanted it in cash.

f.)　　On September 8, 2016, Sheridan wired $158,359.00 from Bank Account 4 to Ideal Classic Cars, LLC.  Records from Ideal Classic Cars, LLC, show that the wire was for the purchase of the defendant 1995 Chevrolet Caprice Classic Wagon, VIN: 1G1BL82P4SR124711, which is a Hollywood reproduction of the Batmobile.  Title Information from the Ohio Bureau of Motor Vehicles shows that this vehicle is currently titled to Ryan P. Sheridan.

g.)　　On September 19, 2016, Sheridan wired $1,000,050.00 from Bank Account 4 to LPL Financial.  These monies were used to purchase approximately 123,635.251 shares of FS Energy & Power Fund, which were held in an investment account at LPL Financial ending xxxx-4688.  Sheridan opened investment account xxxx-4688 on September 9, 2016.

h.)　　On October 12, 2016, Sheridan wired $140,359.00 from Bank Account 4 to Ideal Classic Cars, LLC.  Records from Ideal Classic Cars, LLC, show that the wire was for the purchase of the defendant 1959 Cadillac Hearse, VIN: 59Z023268, which is a Hollywood reproduction of the Ghostbusters vehicle.  Title information from the Ohio Bureau of Motor Vehicles shows that this vehicle is currently titled to Ryan P. Sheridan.

i.)　　On October 18, 2016, Sheridan withdrew $50,000.00 in currency from Bank Account 5.  Talmer Bank and Trust filed a report with FINCEN confirming that the withdrawal was in currency.

j.)　　On October 18, 2016, Sheridan withdrew $42,606.39 from Bank Account 1, which he converted into a cashier's check payable to Greenwood Chevy for the purchase of the defendant 2015 Chevrolet Silverado 2500, VIN: 1GC2KVEG7FZ533179, from Greenwood Chevrolet, Inc.  Title information from the Ohio Bureau of Motor Vehicles shows that this vehicle was initially titled to Braking Point; on April 12, 2017, Sheridan transferred the title to Braking Point Leasing, LLC.

k.) On February 28, 2017, Sheridan purchased from Bank Account 3 a cashier's check for $49,011.29 payable to Metro Land Title Agency. Mahoning County property records show that on March 1, 2017, Sheridan acquired the title to a property located in Austintown, Ohio, for $48,000.00. This property is the residence of JMS.

l.) On June 28, 2017, Sheridan withdrew a total of $50,000.00 in currency from a combination of Bank Account 3 and Bank Account 5. Chemical Bank filed a report with FINCEN confirming that the withdrawal was in currency.

## THE DEFENDANT PROPERTIES

**I.** **$2,244,772.28 seized pursuant to the execution of a federal seizure warrant on October 18, 2017.**

113. On April 18, 2017, Sheridan opened a bank account at Huntington National Bank in the name of Sheridan Enterprises, LLC, ending in xxx3545 (Bank Account 7). Sheridan is the sole signer on the account, and Sheridan is listed as the sole member of Sheridan Enterprises, LLC. Approximately $5,591,949.13 was deposited into Bank Account 7 between April 18, 2017 and August 16, 2017, which consisted of the following:

a.) From May 2017 through August 2017, Bank Account 7 received approximately $3,981,838.12 in transfers from Bank Account 8. As alleged above, Bank Account 8 received, *inter alia*, approximately $4,428,007.06 in electronic payments from the Ohio Department of Medicaid.

b.) On May 25, 2017, Sheridan wire transferred approximately $500,000.00 into Bank Account 7 from Bank Account 2 and, on June 2, 2017, Sheridan wire transferred $500,000.00 into Bank Account 7 from Bank Account 2. As alleged above, Bank Account 2 received, *inter alia,* approximately $16,669,547.12 in electronic payments from the Ohio Department of Medicaid.

46

c.)    On April 28, 2017, Sheridan wire transferred approximately $20,000.00 into Bank Account 7 from Bank Account 3 and, on May 18, 2017, Sheridan wire transferred approximately $500,000.00 into Bank Account 7 from Bank Account 3.  As alleged above, Bank Account 3 received, *inter alia*, $13,997,715.88 in transfers from Bank Account 2.

d.)    On July 18, 2017, a deposit of $90,070.04 was transferred into Bank Account 7 from an account for which supporting documentation has not yet been received.

114.    On October 18, 2017, the defendant $2,244,772.28 was seized from Bank Account 7 pursuant to the execution of a federal seizure warrant.

**II.    $390,066.00 in U.S. Currency seized pursuant to the execution of a federal search warrant on October 18, 2017.**

115.    On August 25, 2016, Sheridan withdrew $100,000.00 in currency from Bank Account 4.  When asked by bank employees if he would accept the cash in another form, Sheridan stated he wanted it in cash.

116.    On October 18, 2016, Sheridan withdrew $50,000.00 in currency from Bank Account 5.  Talmer Bank and Trust filed a report with FINCEN confirming that the withdrawal was in currency.

117.    On June 28, 2017, Sheridan withdrew a total of $50,000.00 in currency from a combination of Bank Account 3 and Bank Account 5.  Chemical Bank filed a report with FINCEN confirming that the withdrawal was in currency.

118.    As alleged above, Bank Accounts 1-9 were funded, either directly or indirectly, by electronic payments made to Braking Point by the Ohio Department of Medicaid.

119.    On one occasion, after withdrawing $100,000.00 of cash from a bank account, Sheridan stated to a person known to law enforcement that he took out the cash because he wanted to have money in his safe.

120.    On October 18, 2017, the defendant $390,066.00 in U.S. Currency was seized pursuant to the execution of a federal search warrant.  The seizure of the defendant currency was made at Sheridan's Spring Hill Drive, Leetonia, Ohio, residence.  The defendant currency, which consisted of numerous stacks of U.S. currency banded with bank bands, was found inside a gun safe in a room in the basement of the residence.

### III.    2016 Cadillac Escalade ESV, VIN: 1GYS4JKJ8GR403801, seized pursuant to the execution of a federal seizure warrant on January 10, 2018.

121.    Sheridan purchased the defendant 2016 Cadillac Escalade ESV, Vehicle ID Number: 1GYS4JKJ8GR403801, on August 3, 2016, from Cole Valley Motors for $93,138.36. Sheridan purchased the vehicle using a cashier's check for $92,556.11 funded from Bank Account 3.

122.    As alleged above, Bank Account 3 received, *inter alia*, $13,997,715.88 in transfers from Bank Account 2, which received, *inter alia*, approximately $16,669,547.12 in electronic payments from the Ohio Department of Medicaid.

123.    Sheridan placed the remaining $582.25 of the purchase price on his debit card associated with Bank Account 1.  Upon its purchase, Sheridan titled the vehicle in the name of Braking Point Recovery Center, LLC.

### IV.    2015 Chevrolet Silverado 2500, VIN: 1GC2KVEG7FZ533179, seized pursuant to the execution of a federal seizure warrant on January 10, 2018.

124.    Sheridan purchased the defendant 2015 Chevrolet Silverado 2500, Vehicle ID Number: 1GC2KVEG7FZ533179, on October 18, 2016, from Greenwood Chevrolet, Inc., for $42,606.39.  Sheridan purchased the vehicle using a cashier's check for $42,606.39 funded from Bank Account 1.

125.    As alleged above, Bank Account 1 received, *inter alia*, approximately $5,805,562.91 in electronic payments from the Ohio Department of Medicaid.

126.    Upon its purchase, Sheridan titled the vehicle in the name of Braking Point Recovery Center, LLC. On April 12, 2017, Sheridan transferred the title of the vehicle to Braking Point Leasing, LLC.

**V.    1995 Chevrolet Caprice Classic Wagon ("Batmobile"), VIN: 1G1BL82P4SR124711, seized pursuant to the execution of a federal seizure warrant on January 10, 2018.**

127.    Sheridan purchased the defendant 1995 Chevrolet Caprice Classic Wagon ("Batmobile"), VIN: 1G1BL82P4SR124711, on September 8, 2016, from Ideal Classic Cars, LLC, for $160,359.00. The vehicle is a Hollywood reproduction of the Batmobile. On September 7, 2016, Sheridan placed a down payment of $2,000.00 on his debit card associated with Bank Account 1. On September 8, 2016, Sheridan completed the purchase wire transferring $158,359.00 to Ideal Classic Cars, LLC, from Bank Account 4.

128.    As alleged above, Bank Account 4 received, *inter alia*, at least $2,365,643.00 in transfers from Bank Account 1, which received, *inter alia*, approximately $5,805,562.91 in electronic payments from the Ohio Department of Medicaid.

129.    Upon its purchase, Sheridan titled the vehicle to himself, Ryan P. Sheridan.

**VI.    1981 DeLorean DMC Gullwing ("Back to the Future" vehicle), Vehicle ID Number: SCEDT26T1BD006297, seized pursuant to the execution of a federal seizure warrant on January 10, 2018.**

130.    Sheridan purchased the defendant 1981 DeLorean DMC Gullwing ("Back to the Future" vehicle), VIN: SCEDT26T1BD006297, on August 3, 2016, from Paul Casey Entertainment, LLC, for $51,300.00. The vehicle is a Hollywood reproduction of the vehicle featured in the movie "Back to the Future". Sheridan purchased the vehicle via a wire transfer in the amount of $51,300.00 from Bank Account 4.

49

131.     As alleged above, Bank Account 4 received, *inter alia*, at least $2,365,643.00 in transfers from Bank Account 1, which received, *inter alia*, approximately $5,805,562.91 in electronic payments from the Ohio Department of Medicaid.

132.     Upon its purchase, Sheridan titled the vehicle to himself, Ryan P. Sheridan.  On April 12, 2017, Sheridan transferred the title of the vehicle to Sheridan's Cool Cars, LLC.

**VII.    1959 Cadillac Hearse ("Ghostbusters vehicle"), VIN: 59Z023268, seized pursuant to the execution of a federal seizure warrant on January 10, 2018.**

133.     Sheridan purchased the defendant 1959 Cadillac Hearse ("Ghostbusters vehicle"), VIN: 59Z023268, on October 12, 2016, from Ideal Classic Cars, LLC, for $145,359.00.  The vehicle is a Hollywood reproduction of the featured vehicle in the movie "Ghostbusters". Sheridan purchased the vehicle via a wire transfer in the amount of $140,359.00 from Bank Account 4.  On October 12, 2016, Sheridan also paid $5,000.00 using his debit card associated with Bank Account 5.

134.     As alleged above, Bank Account 4 received, *inter alia*, at least $2,365,643.00 in transfers from Bank Account 1, which received, *inter alia*, approximately $5,805,562.91 in electronic payments from the Ohio Department of Medicaid.

135.     Upon its purchase, Sheridan titled the vehicle to himself, Ryan P. Sheridan.

**VIII.   Contents of LPL Financial Account 68\*\*-\*\*\*\* seized on February 2, 2018; balance as of February 2, 2018: $326,707.62.**

136.     On September 9, 2016, Sheridan opened LPL Financial Account ending xxx-4688 ("the initial investment account").  Sheridan was the sole account holder on the initial investment account, which was a non-retirement brokerage account.

137.     On September 19, 2016, Sheridan wired $1,000,050.00 from Bank Account 4 into the initial investment account and used those funds to purchase 123,635.251 shares of FS Energy

& Power Fund.  No other external funds were deposited into the initial investment account, and dividends earned were reinvested.

138.     As alleged above, Bank Account 4 received, *inter alia*, at least $2,365,643.00 in transfers from Bank Account 1, which received, *inter alia*, approximately $5,805,562.91 in electronic payments from the Ohio Department of Medicaid.

139.     On January 4, 2017, Sheridan opened LPL Financial Account 68**-**** ("the subject investment account").  Sheridan is the sole account holder on the subject investment account, which is a non-retirement brokerage account.

140.     On January 25, 2017, the subject investment account was funded by a transfer in of 125,891.369 shares of FS Energy & Power Fund, which on January 31, 2017 were valued at $925,251.56.  These shares previously were purchased and held by Sheridan in his LPL Financial Account ending  xxx-4688.  No additional external funds were deposited into the subject investment account.

141.     In January 2018, Sheridan withdrew approximately $560,000.00 from the subject investment account.

142.     Pursuant to the execution of a federal seizure warrant on February 2, 2018, LPL Financial put a full restriction on the subject investment account, which will prohibit any withdrawals.  The contents of the subject investment account is a defendant property in the instant case.  As of February 2, 2018, the balance of the subject investment account was $326,707.62.

**CONCLUSION**

143.     By reason of the foregoing, the defendant properties are subject to forfeiture to the United States under 18 U.S.C. § 981(a)(1)(C) in that they constitute – or are derived from –

51

proceeds traceable to violation(s) of 18 U.S.C. § 1347 (health care fraud) and 18 U.S.C. § 1349 (conspiracy to commit health care fraud).

144.    By reason of the foregoing, the defendant properties also are subject to forfeiture to the United States under 18 U.S.C. § 981(a)(1)(A) in that they were involved in a transaction(s) in violation of 18 U.S.C. § 1957 (money laundering), or are property traceable to such property.

WHEREFORE, plaintiff, the United States of America, requests that the Court enter judgment condemning the defendant properties and forfeiting them to the United States, and providing that the defendant properties be delivered into the custody of the United States for disposition according to law, and for such other relief as this Court may deem proper.

Respectfully submitted,

Justin E. Herdman
U.S. Attorney, Northern District of Ohio

By:    _____
James L. Morford (Ohio: 0005657)
Assistant United States Attorney, N.D. Ohio
Carl B. Stokes U.S. Court House
801 West Superior Avenue, Suite 400
Cleveland, Ohio  44113
216.622.3743 / Fax: 216.522.7499
James.Morford@usdoj.gov

## VERIFICATION

STATE OF OHIO        )
                                ) SS.
COUNTY OF CUYAHOGA  )

I, James L. Morford, under penalty of perjury, depose and say that I am an Assistant

United States Attorney for the Northern District of Ohio, and the attorney for the plaintiff in the

within entitled action. The foregoing Complaint in Forfeiture is based upon information

officially provided to me and, to my knowledge and belief, is true and correct.


_____

James L. Morford (Ohio: 0005657)
Assistant United States Attorney, N.D. Ohio


Sworn to and subscribed in my presence this 15th day of March, 2018.


_____

Notary Public

DANIEL R. RANKE, Attorney At Law
Notary Public - State of Ohio
My commission has no expiration date.
Section 147.03 O. R. C.

53